| | |
|---|---|
| Kade Vershey and Nicole Vershey, | File No. 19-cv-1625 (ECT/KMM) |
| Plaintiffs, | |
| and | |
| Meridian Security Insurance Company, as subrogee of Kade Vershey and Nicole Vershey, | **OPINION AND ORDER** |
| Intervenor-Plaintiff, | |
| v. | |
| James D. Madison and Constance M. Madison, | |
| Defendants. | |

_____

Court J. Anderson and Benjamin J. Hamborg, Henson & Efron, P.A., Minneapolis, MN, for Plaintiffs Kade Vershey and Nicole Vershey.

Jonathan M. Levy and Ruth Evelyn Welch, Cozen O'Connor, Chicago, IL; and Heather L. Marx and Peter L. Crema, Jr., Cozen O'Connor, Minneapolis, MN, for Intervenor-Plaintiff Meridian Security Insurance Company.

Jeffrey A. Wieland, Moss & Barnett, Minneapolis, MN, for Defendants James D. Madison and Constance M. Madison.

_____

In this diversity case, Plaintiffs Kade and Nicole Vershey seek to rescind their purchase of a home from Defendants James and Constance Madison. The home is in Pequot Lakes, Minnesota. The Versheys allege that rescission is appropriate because the Madisons did not disclose material facts that adversely affected the Versheys' enjoyment

of the property. These undisclosed material facts included a mice infestation, water intrusion, and an easement in favor of an adjacent property via the home's driveway. As an alternative to rescission, the Versheys seek damages from the Madisons in an amount sufficient to remedy these problems. The Madisons have moved for summary judgment. The motion will be denied. There really isn't any question under the applicable law and facts that a trier of fact reasonably could side with the Versheys and award rescission or, alternatively, damages in their favor.

I

The Madisons purchased the home in 2006. J. Madison Dep. 27[1] [ECF No. 61-1 at 90–151]. After performing major renovations, they lived in the home from 2008 until June 2017. *Id.* at 40. At some point, the Madisons decided to sell the home and move to Nevada. *Id.* at 3–4.

In April 2016, as part of putting the home up for sale, the Madisons completed a form disclosure statement. ECF No. 1-1 ("Disclosure Statement"). The form accurately described the Madisons' disclosure obligations under Minnesota law as follows:

> Under Minnesota law, sellers of residential property, with limited exceptions . . . are obligated to disclose to prospective buyers all material facts of which Seller is aware that could adversely and significantly affect an ordinary buyer's use or enjoyment of the property or any intended use of the property of which Seller is aware. MN Statute 513.58 requires Seller to notify buyer in writing as soon as reasonably possible, but in any event before closing, if Seller learns that Seller's disclosure was inaccurate. Seller is obligated to continue to notify Buyer, in writing, of any facts disclosed herein (new or

---

[1] Citations to deposition transcripts will refer to original transcript pagination. Other exhibit citations will refer to ECF pagination.

> changed) of which Seller is aware that could adversely and significantly affect the Buyer's use or enjoyment of the property or any intended use of the property that occur up to the time of closing.

*Id.* at 1. The Madisons represented several relevant facts on their disclosure statement: (1) that there were no past or present "Animal/Insect/Pest Infestations"; (2) in a section titled "The Roof," that there had been no "leakage," "no interior or exterior damage," and no "interior damage from ice buildup"; (3) that there were no easements on the property; and (4) that they were not "aware of any other material facts that could adversely and significantly affect an ordinary buyer's use or enjoyment of the property or any intended use of the property." *Id.* at 2–4, 6–7.

The Versheys signed an agreement to purchase the property in October 2017. Third Wieland Decl., Ex. F [ECF No. 61-1 at 188–203]. As a condition of the sale, a visual inspection was performed; it revealed no need for "major" repairs. *Id.* at 192; *see id.*, Ex. G [ECF No. 61-1 at 204–234]. The sale closed in January 2018, and the Versheys moved in that month. N. Vershey Dep. 23, 25 [ECF No. 61-1 at 152–187]; K. Vershey Dep. 20 [ECF No. 61-1 at 15–44]. Not long after they moved in, the Versheys discovered essentially three problems—problems they allege the Madisons did not disclose—that form the basis of their claims in this case.

There were many mice. In their first month in the home, the Versheys trapped 39 mice. Anderson Decl., Ex. B at 12 [ECF No. 73-2]. In addition to the trapped mice, the Versheys observed feces, urine, and grease stains throughout the home, smelled a pungent odor, and heard mice in the walls. K. Vershey Decl. ¶¶ 2–3 [ECF No. 72]. In February

2019, an exterminator found mice activity in nearly all accessible walls and unsealed areas, concluding that mice had been a problem in the home "way before [the] Versheys took ownership." Anderson Decl., Ex. A at 99 [ECF No. 73-1]. Despite working with exterminators, the problem has endured. K. Vershey Decl. ¶ 3–4. The Versheys "still regularly find evidence of mice, including urine, feces, grease stains, and dead mice in traps." Id. ¶ 4, Ex. A at 1–38 [ECF No. 72–1].

The Madisons acknowledge there were mice in the home when they lived there. They hired exterminators on at least a few separate occasions. C. Madison Dep. 55 [ECF No. 61-1 at 45–89]; J. Madison Dep. 64–65. The Madisons first called an exterminator when they had trapped mice "for two or three days" without eliminating the problem. C. Madison Dep. 50–52. The Madisons saw feces and other evidence of mice throughout the home and grew "quite used to saying, 'we'll have to get the exterminator back, because the mice are starting to come again.'" J. Madison Dep. 77, 80; C. Madison Dep. 58–59. The Madisons considered reporting the issue in the Disclosure Statement but opted not to because they concluded that no "infestation" existed. C. Madison Dep. 66. In July 2016 (some three months after completing the Disclosure Statement), the Madisons retained an exterminator to seal the home and place traps. The exterminator returned one week later to find fifteen trapped mice. J. Madison Dep. 125–27, 161–62.

There was water intrusion. In March 2018, roughly two months after they moved in, the Versheys discovered water dripping from the living room ceiling, running down the chimney, and puddling near the fireplace mantle. K. Vershey Dep. 30; N. Vershey Dep. 43. A roofer made two visits to diagnose the problem and, suspecting an exterior leak,

4

applied sealant near the chimney's exterior. K. Vershey Dep. 31–32; Third Wieland Decl., Ex. A at 1–2 [ECF No. 61-1 at 1–14] ("Pls.' Am. Answers to Defs.' Interrog."). The leaking subsided until November 2018, when water began dripping more rapidly from the ceiling near the chimney and fireplace and in several other rooms. N. Vershey Dep. 46–47; K. Vershey Dep. 32. The Versheys then noticed (they say for the first time) "previous stains on carpet and walls" and "rotted holes in knotty pine ceiling." Pls.' Am. Answers to Defs.' Interrog. at 2. They hired another inspector, who examined the internal roof cavity and found saturated insulation and significant moisture saturating the roof's interior. K. Vershey Dep. 32–33.

On December 11, the Versheys reported the water damage to their homeowner's insurer, Meridian Security Insurance Company. Second Wieland Decl., Ex. 1 [ECF No. 51-1 at 1]; *see* Levy Decl., Ex. A [ECF No. 75-1]. Meridian, in turn, hired Donan Engineering Company to investigate. Donan concluded that the widespread water damage stemmed from condensation in the home's roof cavity. *See* Second Wieland Decl., Ex. 2 at 5–6 [ECF No. 51-1 at 2–19] ("Donan Report"). Donan found "[n]o openings or gaps at the seams [] in the metal roof panels" and concluded the condensation was "caused by the lack of ventilation in the roof above the house." *Id.* at 6. The next month, another inspector concluded that "condensation formed as a result of warm moist air contacting cold surfaces in the roof plane due to ineffective vapor barrier, lack of roof ventilation, and insufficient insulation," and that "[s]imilar conditions likely existed in the exterior walls due to similar construction techniques." Second Wieland Decl., Ex. 3 at 23 [ECF No. 51-1 at 20–65]. Meridian declined coverage for the full repair cost necessary to remedy the home's design

5

problems, but it paid the Versheys over $130,000 for "water damages to knotty pine ceilings, drywall attic insulation[,] and flooring of the dwelling[.]" Levy Decl., Ex. B [ECF No. 75-2], Ex. C [ECF No. 75-3].

Subsequent inspections have confirmed that the moisture problem stems from condensation in the roof cavity.[2] The repair estimate has grown to over $330,000. *See* Third Wieland Decl., Ex. H [ECF No. 61-1 at 235–237]. Recommended repairs now include disassembly and removal of existing materials and installing a "fully sealed vapor retarder," "continuous insulation and a weather barrier behind the exterior wood log cladding," and "continuous insulation above the existing roof and the addition of a new metal roof." *Id.*, Ex. I at 239 [ECF No. 61-1 at 238–253] ("Second Rimkus Report"). The Versheys have not begun repairs to address the damage caused by this problem or to remedy the underlying cause of the problem. K. Vershey Dep. 41–42.

The Madisons deny knowledge of any moisture in the ceiling and roof cavity from their time in the home, J. Madison Dep. 21, 35, but admit they experienced water intrusion on at least two occasions when they owned the home. In April 2013, the Madisons discovered water flowing from the ceiling, down the chimney, and on to the fireplace mantle—the same area where the Versheys later first saw moisture. *Id.* 47–48; C. Madison Dep. 38–39. The Madisons retained a contractor to address the problem. The contractor identified no problems with the roof's exterior surface and applied a liquid sealant to the

---

[2] The Madisons' retained expert inspected the home and agrees that water intrusion is caused by "condensation of water vapor within the unvented roof assembly." Third Wieland Decl., Ex. J at 259–60 [ECF No. 61-1 at 254–277].

chimney and nearby flashing. J. Madison Dep. 12, 48–49; C. Madison Dep. 40–41. The issue subsided until the late summer or fall months of 2017, after the Madisons moved out. J. Madison Dep. 50–51; C. Madison Dep. 43. At that time, the home's caretaker called the Madisons to alert them of moisture intrusion, again on the chimney and fireplace. C. Madison Dep. 43; J. Madison Dep. 50–51. Another contractor was retained to assess the problem. The contractor determined there was no exterior leak, though it did replace the chimney cap and some flashing. J. Madison Dep. 53. The Madisons paid for these repairs on October 26, 2017, after entering the purchase agreement and five days before the Versheys would perform their inspection. C. Madison Dep. 111–14; Anderson Decl., Ex. B at 11. The Madisons did not inform the Versheys or the realtor of these repairs. C. Madison Dep. 116.

Finally, there was the easement. The Madisons recorded the easement in December 2016, when they split their property into two parcels the Parties have called "Tract A" and "Tract B." J. Madison Dep. 99; *see* Anderson Decl., Ex. A at 65–72. The home sits on Tract A. Neighboring Tract B consists of thirty acres, a barn, and horse sheds. To avoid "land-locking" Tract B, the Madisons conveyed an easement in Tract B's favor granting ingress and egress through the home's driveway. *See id.* at 72; J. Madison Dep. 95. When they purchased the home, the Versheys knew the Madisons had sold Tract B "under a one[-]year contract for deed to become due" in July 2018. Third Wieland Decl., Ex. F at 188. The Versheys even negotiated a thirty-day right of first refusal to purchase Tract B if the buyer defaulted. *Id.* But they did not know about the easement. N. Vershey Dep. 64; K. Vershey Dep. 16–17, 47–49; J. Madison Dep. 105–06. The easement has caused problems

for the Versheys. After the sale, Tract B's owners converted it to a rental property and have cleared land to construct more buildings. This development causes a heightened volume of regular traffic involving Tract B tenants and construction vehicles. The Versheys say the easement endangers their children and pets, wears down their asphalt driveway, and has reduced the home's resale value. K. Vershey Dep. 50–52; N. Vershey Dep. 60–61.

The Versheys brought this case in June 2019. Compl. [ECF No. 1]. They assert four claims arising essentially from the Madisons' failure to disclose the mice infestation, water intrusion, and easement: (1) a claim under Minn. Stat. §§ 513.52–.61, which establish disclosure obligations for sellers of residential property, Compl. ¶¶ 27–37; (2) a claim for common law fraud, *id.* ¶¶ 38–47; (3) a claim for common law negligent misrepresentation, *id.* ¶¶ 48–53; and (4) a claim under the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, Compl. ¶¶ 54–57. Meridian then intervened as subrogee of the Versheys seeking to recover for the water-damage claims it paid under the homeowner's policy. ECF Nos. 14, 15.

II

A

There is subject-matter jurisdiction over this case on the basis of diversity under 28 U.S.C. § 1332(a)(1). There is complete diversity between the Parties. The Versheys are Minnesota citizens. Compl. ¶ 1. If it matters, Meridian is a corporation organized under Indiana law and maintains its principal place of business in Ohio. ECF No. 22 ¶ 1. And the Madisons are Nevada citizens. Compl. ¶ 2. The Versheys paid $480,000 to purchase

8

the property, Anderson Decl., Ex. C [ECF No. 73-3 at 7], so the value of rescission from the Versheys' perspective exceeds § 1332's jurisdictional floor. *Usery v. Anadarko Petroleum Corp.*, 606 F.3d 1017, 1018 (8th Cir. 2010) ("We have held repeatedly that in a suit for declaratory or injunctive relief the amount in controversy is the value to the plaintiff of the right that is in issue."). If the Versheys' alternative damages claim is the measure, the repair estimate with respect to just the water-infiltration issue is over $330,000. *See* Third Wieland Decl., Ex. H.

"Federal courts sitting in diversity apply state substantive law." *Morgantown Mach. & Hydraulics of Ohio, Inc. v. Am. Piping Prods., Inc.*, 887 F.3d 413, 415 (8th Cir. 2018) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). The Parties agree that Minnesota law governs the case, and there is no reason to second-guess the Parties' agreement on the choice-of-law question. *See Netherlands Ins. Co. v. Main Street Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014) ("Because the parties do not dispute the choice of Minnesota law, we assume, without deciding, Minnesota law applies[.]"); *see also Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010). In applying Minnesota law, a federal district court sitting in diversity must follow decisions of the Minnesota Supreme Court or, in the absence of binding precedent from that court, "must predict how the Supreme Court of Minnesota would rule, and . . . follow decisions of the [Minnesota Court of Appeals] when they are the best evidence of Minnesota law." *Netherlands Ins. Co.*, 745 F.3d at 913 (quoting *Friedberg v. Chubb & Son, Inc.*, 691 F.3d 948, 951 (8th Cir. 2012)).

Of course, a federal court sitting in diversity applies the familiar federal summary-judgment standards. Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255 (citation omitted).

B

The Madisons take something of a divide-and-conquer approach to support their summary-judgment motion against the Versheys' claims, separately challenging different aspects of the claims on different grounds. To summarize, the Madisons first argue that the Versheys' claims based on water intrusion fail because no reasonable trier of fact could find that the Madisons knew about the condensation-in-the-roof-cavity problem. Alternatively, the Madisons argue that even if there were evidence suggesting they knew of the condensation problem, the disclosure statement required disclosure of roof "leakage," and condensation, the Madisons argue, isn't "leakage." The Madisons next argue that the Versheys' easement-based claims are not trial-worthy because the Versheys possessed at least constructive knowledge of the easement. The Madisons challenge the Versheys' right to seek rescission, arguing that the law does not authorize the remedy here and that, if it did, the Versheys have not preserved the right to pursue it. Finally, the

Madisons argue that Meridian's subrogation claim cannot proceed because as a matter of law Meridian lacked any reasonable basis to pay the Versheys' water-damage claim.

The Versheys' claims under Minn. Stat. §§ 513.52–.61 and for common law fraud seem to share the same scienter element. The disclosure required by Minn. Stat. § 513.55, subd. 1(a) "must be made in good faith and based upon the best of the seller's knowledge at the time of disclosure." *Id.*, subd. 1(b). "A seller who fails to make a required disclosure and 'was aware of material facts pertaining to the real property is liable to the prospective buyer.'" *Mattinen v. Kari*, No. A19-1976, 2020 WL 3494295, at *3 (Minn. Ct. App. June 29, 2020) (quoting Minn. Stat. § 513.57, subd. 2). The common law fraud claim requires, among other elements, "a false representation by a party of a past or existing material fact susceptible of knowledge . . . made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false[.]" *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986).

The Versheys' claims under Minn. Stat. § 325F.69 and for common law negligent misrepresentation are different. Neither claim requires a plaintiff to show that a representation was made with knowledge of its falsity—negligence is enough. *McNamara v. Nomeco Bldg. Specialties, Inc.*, 26 F. Supp. 2d 1168, 1171 (D. Minn. 1998) ("The weight of authority in this jurisdiction holds that negligent misrepresentations, which are made in connection with the sale of merchandise, are actionable as consumer fraud [under Minn. Stat. § 325F.69]."); *Adams v. Rosensteel*, No. A13-0451, 2013 WL 6223562, at *3 (Minn. Ct. App. Dec. 2, 2013) ("Negligent misrepresentation has the same elements as fraud, except it does not have an intent element.").

11

Judged against these standards, the Versheys have identified evidence sufficient to show that their fraud claims concerning water intrusion are trial-worthy. First, there is evidence permitting the reasonable inference that the Madisons knew about the condensation problem. For example, after they discovered the issue in November 2018, the Versheys noticed "previous stains on carpet and walls" and "rotted holes in [the] knotty pine ceiling." Pls.' Am. Answers to Defs.' Interrogatories at 2. The Versheys also discovered "different insulation, different vapor barrier, different staples, and different tape" inside one wall. K. Vershey Dep. 38–39; Second Rimkus Report at 239, 245–47. It also seems important that a design defect caused the condensation problem, and that the Madisons had lived in the home for roughly nine years. The more widespread signs of water damage permit the inference that a more widespread water intrusion problem predated the Versheys' purchase of the home, and the condensation problem is the only issue the Parties identify that might have caused a more widespread problem. The different materials found inside one wall suggest attempts were made to address the condensation problem. *See* Second Rimkus Report at 239, 245–47. Under the summary-judgment standard, the presence of alternative explanations for the presence of these different materials is beside the point. Second, whether the Madisons knew the source of the water intrusion problem or not (*i.e.*, whether the water intrusion they experienced was caused by roof-cavity-condensation or something else), a reasonable factfinder still might find the Madisons knowingly withheld "material" facts. *See STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 77 (Minn. 2002) ("Materiality is ordinarily a question of fact."). There is evidence that (1) the Madisons twice experienced and paid for repairs to stop water

leaking from the living room ceiling and on to the chimney; (2) the Madisons last paid for repairs on October 26, 2017—after agreeing to sell the home and just five days before the Versheys' inspection; and (3) the Versheys experienced the same type of water intrusion in the same region of the home in March 2018, roughly two months after moving in. The Madisons' argument that the condensation problem isn't "leakage" also doesn't change things. Minnesota law required the Madisons to disclose "all material facts of which the [Madisons were] aware that could adversely and significantly affect . . . an ordinary buyer's use and enjoyment of the property[.]" Minn. Stat. § 513.55, subd. 1(a)(1). That's more than just "leakage." A reasonable factfinder could decide that widespread water intrusion—whether resulting from condensation, leakage, or some other cause—meets this standard. That a trier of fact reasonably could conclude the Madisons knew about, but did not disclose, the condensation problem, or that the water intrusion the Madisons admit to experiencing was a material fact, (in other words, that the Versheys' fraud claims are trial-worthy) logically means the Versheys' negligence-based claims also are headed to trial.[3]

The law does not support the Madison's argument that the Versheys had at least constructive knowledge of the easement. To support this argument, the Madisons rely on

---

[3] The summary-judgment briefing left open questions that will need to be addressed before or at trial. For example, it is questionable under Minnesota law whether a negligent misrepresentation claim may be brought when the alleged misrepresentation was made by one party to an arm's-length commercial transaction. *Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.*, ___ F. Supp. 3d ___, No. 20-cv-1731 (ECT/KMM), 2021 WL 465323, at *12 (D. Minn. Feb. 9, 2021) (collecting cases). And it is not clear whether the Versheys can show a public benefit essential to their claim under Minn. Stat. § 325F.69. *See Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000). The Madisons did not raise either of these issues in their motion. Finally, if it matters, whether the understanding of "leakage" (as the word is used on the disclosure statement) is a question of law or fact remains open.

a Minnesota statute that says "[t]he record . . . of any instrument properly recorded shall be taken and deemed notice to parties," Minn. Stat. § 507.32, evidently intending to suggest that no matter what they disclosed or did not disclose to the Versheys, the Versheys were "deemed" to have notice of the easement before they purchased the property because the easement had been recorded. This is not correct. "[T]he recipient of a fraudulent misrepresentation of material fact is justified in relying upon its truth, although he might have ascertained its falsity had he made an investigation." *Spiess v. Brandt*, 41 N.W.2d 561, 566 (Minn. 1950) (citing Restatement (Second) of Torts § 540); *see Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 320–21 (Minn. 2007). This "rule . . . is applicable even though the fact that is fraudulently represented is required to be recorded and is in fact recorded. The recording acts are not intended as a protection for fraudulent liars." Restatement (Second) of Torts § 540, cmt. b. Section 540 makes its proper application to this case clear by way of an illustration:

> A, seeking to sell land to B, tells B that the land is free from all incumbrances. By walking across the street to the office of the register of deeds in the courthouse, B could easily learn that there is a recorded and unsatisfied mortgage on the land. B does not do so and buys the land in reliance upon A's misrepresentation. His reliance is justifiable.

*Id.*, Illustration 1. Here, the Madisons disclosed that they were unaware of any easements on the property. Disclosure Statement at 2; J. Madison Dep. 100. The Madisons conveyed and recorded the easement in December 2016, but never amended the disclosure statement or discussed the easement with the Versheys prior to their purchase of the property. J.

14

Madison Dep. 105–06; K. Vershey Dep. 47–50. The Versheys have testified they did not know about the easement until after they purchased the property.[4]

The Madisons' position that the Versheys cannot seek rescission implicates several settled rules regarding this equitable remedy. Rescission renders an "entire contract . . . voidable" and returns parties to their pre-contractual positions. *SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 865 (Minn. 2011). "A contract is voidable if a party's assent is induced by a fraudulent misrepresentation on which the party is justified in relying." *MCC Invs. v. Crystal Props.*, 415 N.W.2d 908, 911 (Minn. Ct. App. 1987). The Minnesota Supreme Court has made clear that a plaintiff may pursue either rescission or damages "or both alternatively until one affords a remedy and the claimant is not bound by his election until one remedy is pursued to a determinative conclusion." *Nw. State Bank, Osseo v. Foss*, 197 N.W.2d 662, 665–66 (Minn. 1972). Though courts often recognize "pecuniary damage" as an element of fraud under Minnesota law, *e.g.*, *Hoyt Props., Inc.*, 736 N.W.2d at 318, "fraud without damage . . . will sustain a cause of action for rescission[.]" *Jacobs v. Farmland Mut. Ins. Co.*, 377 N.W.2d 441, 445 (Minn. 1985) (quoting *Dupont v. Haggard*, 49 N.W.2d 186, 187 (Minn. 1951)); *see also* 20A2 Brent A. Olson, Minn. Prac. Series Bus. L. Deskbook § 34:70 (Nov. 2020 Update). A buyer forfeits the right to rescind when it "either affirms the transaction with

---

[4] The Madisons argue that the Versheys possessed inquiry notice of the easement as a matter of law because the Versheys knew of "the fact that the driveway is the only way the owner of the adjacent landlocked parcel can access that property[.]" Defs.' Mem. in Supp. at 33 [ECF No. 60]. The record does not support this assertion. The Versheys testified they did not know the driveway was Tract B's only access point. K. Vershey Dep. 49–50.

15

knowledge of the fraud or . . . fails to disaffirm the transaction within a reasonable time after discovery of the fraud." *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1087 (D. Minn. 2013) (quoting *Hemming v. Ald, Inc.*, 155 N.W.2d 384, 386 (Minn. 1967)). Whether a party has disaffirmed a transaction within a reasonable time "depends, first, upon a determination of when the fraud was in fact discovered and, second, a determination of what may be deemed a reasonable time subsequent to [discovery]." *Id.* (quoting *Hemming*, 155 N.W.2d at 386–87). Discovery occurs when "the buyer has actual knowledge of the nature and extent of the fraud." *Id.* (quoting *Hemming*, 155 N.W.2d at 387). "Although there may be cases in which the delay is so substantial and excuse for delay is so lacking that the right of rescission might be deemed waived or barred as a matter of law, courts are usually reluctant to preclude a defrauded person from his remedy." *Hemming*, 155 N.W.2d at 388 (footnote omitted).

It would be plain error to enter summary judgment against the Versheys' right to rescission based on the Madisons' arguments. Two of the Madisons' arguments—that the Versheys may not seek rescission and damages and that the Versheys must show damages to obtain rescission—contradict applicable law. The law says the Versheys may seek rescission and damages alternatively until either "is pursued to a determinative conclusion." *Nw. State Bank, Osseo*, 197 N.W.2d at 665–66. It also says that "fraud without damage . . . will sustain a cause of action for rescission[.]" *Farmland Mut. Ins. Co.*, 377 N.W.2d at 445. The Madisons' final argument is that the Versheys forfeited the right to rescind by (1) waiting an unreasonably long time to disaffirm the purchase agreement after discovering the alleged fraud and (2) ratifying the purchase agreement by

16

making improvements to the property and accepting an insurance payment from Meridian for water damage. Defs.' Mem. in Supp. at 33–35; Defs.' Reply Mem. at 7–9 [ECF No. 85]. The evidence, however, is not so one-sided to warrant the entry of summary judgment on these issues. A trier of fact might reasonably conclude that the Versheys did not wait an unreasonably long time to disaffirm. Take the mice. Though it's undisputed the Versheys found evidence of mice soon after moving in, K. Vershey Decl. ¶¶ 2–3, a factfinder might decide the Versheys reasonably were unaware of the extent of the problem until later, when mice remained despite their initial remediation efforts, *id.* ¶ 5; *see* Anderson Decl., Ex. A at 99–100. The same reasoning applies to the water intrusion. The Versheys experienced a leak in March 2018, but minor repairs halted the issue until November 2018, when the problem escalated. At that point, the Versheys hired an inspector, who first identified moisture in the roof's interior. There is evidence the Versheys then promptly arranged a more invasive inspection that revealed the underlying condensation issue in December 2018. K. Vershey Dep. 31–34; Pls.' Am. Answers to Defs.' Interrog. at 1–2; Donan Report. A trier of fact might also reasonably conclude that the Versheys' improvements did not ratify the purchase. The improvements the Madisons identify were not so substantial as to warrant forfeiture as a matter of law. They included installation of a backsplash in the kitchen, painting, updating appliances, fixing a boiler system, replacing an air conditioner, and building a goat and chicken enclosure. *See* Defs.' Mem. in Supp. at 34. Persuasive authorities support the determination that a factfinder must resolve this question. *See Damon*, 937 F. Supp. 2d at 1087–88 (rescission available when buyer had "paid for substantial build-outs and encumbered [commercial] units with

leases"); *Gary v. Conrad*, Nos. C7-97-1784, C0-98-177, 1998 WL 404951, at *3–4 (Minn. Ct. App. July 21, 1998) (affirming rescission award despite over $15,000 in post-sale improvements); *MCC Invs.*, 415 N.W.2d at 911 (rescission available despite post-sale mortgage refinancing, as buyer could restore possession of the building, fee title, and all rental income and damage deposits it collected post-sale).[5]

C

The Madisons also seek summary judgment against Meridian's subrogation claim, arguing that Meridian's payment of policy benefits to the Versheys was voluntary as a matter of law. The Madisons are correct that, to become a subrogee, the general rule is that a party must have been under some compulsion or protecting its own interests in covering a third party's loss; "a mere volunteer or intermeddler" has no subrogation rights. *Universal Title Ins. Co v. United States*, 942 F.2d 1311, 1315 (8th Cir. 1991) (citing *City of Red Wing v. Eichinger*, 203 N.W. 622, 623 (Minn. 1925)). In other words, an insurer who pays a claim gratuitously possesses no subrogation interest against a responsible wrongdoer.

Several other rules, however, are relevant. The dispositive question is whether the insurer paid the claim in good faith. "[I]f the liability is not clear and the insurance

---

[5] The Madisons also argue that the Versheys ratified their purchase by filing an insurance claim with Meridian and accepting over $130,000 for water damage. Defs.' Reply Mem. at 8–9. But a party does not ratify a contract merely by trying to avoid loss. *Ponzo v. Affordable Homes of Rochester, LLC*, No. A04-2234, 2005 WL 1804644, at *5 (Minn. Ct. App. Aug. 2, 2005) (remaining in home did not ratify contract); *Damon*, 937 F. Supp. 2d at 1088 (buyer's ongoing efforts to find tenants did not ratify contract as a matter of law).

18

company acts *in good faith* to pay the loss, even the fact that the loss was not covered does not necessarily make the insurance company a volunteer." *State Farm Mut. Auto Ins. Co. v. Beauchane*, No. A14-0986, 2015 WL 1514025, at *5 (Minn. Ct. App. Apr. 6, 2015) (quoting *Northland Ins. Co. v. Ace Doran Hauling & Rigging Co.*, 415 N.W.2d 33, 39 (Minn. Ct. App. 1987)). An insurer that pays a claim to protect its own economic interests—such as avoiding the expense of uncertain coverage litigation or preserving business relationships and customer goodwill—may meet the good-faith standard. *See Am. Com. Lines, Inv. v. Valley Line Co.*, 529 F.2d 921, 924 (8th Cir. 1976) (payments involuntary where "made under legal compulsion to avoid potential in personam and in rem liability, or at least a complex lawsuit"); *Jorge v. Travelers Indem. Co.*, 947 F. Supp. 150, 155–57 (D.N.J. 1996) ("[I]nterests in preserving business relationships, in controlling the defense of the action, and in avoiding entanglement in complex insurance coverage litigation more than suffice to prevent [insurer] from being labeled a volunteer."); *Grinnell Mut. Reinsurance Co. v. Ctr. Mut. Ins. Co.*, 658 N.W.2d 363, 379–80 (N.D. 2003) (same); *Nappi v. Nappi Distribs.*, 691 A.2d 1198, 1200–01 (Me. 1997) (company's reputational interests and threat of litigation rendered payment involuntary). Not surprisingly, then, deciding whether a payment is voluntary usually requires resolving questions of fact. *See Weir v. Fed. Ins. Co.*, 811 F.2d 1387, 1395 (10th Cir. 1987); *N. Am. Ins. Co. v. Kemper Nat'l Ins. Co.*, 758 N.E.2d 856, 860–61 (Ill. App. Ct. 2001); *Argonaut Ins. Co. v. Allstate Ins. Co.*, 869 S.W.2d 537, 543 (Tex. Ct. App. 1993).

The record does not justify the entry of summary judgment against Meridian's subrogation claim. The Madisons raise reasonable questions concerning Meridian's

19

interpretation of its policy. But no evidence has been identified that answers the dispositive question—whether, if its policy interpretation is incorrect, Meridian nonetheless acted in good faith—as a matter of law. The viability of Meridian's subrogation interest is therefore an issue that must be decided at trial.

**ORDER**

Based on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendants' Motion for Summary Judgment [ECF No. 58] is **DENIED**.

Dated: June 8, 2021              s/ Eric C. Tostrud
                                 Eric C. Tostrud
                                 United States District Court